**WILLIAM GOLDMAN THEATRES, Inc., v. LOEW'S, Inc., et al.**

Civil Action No. 2877.

District Court, E. D. Pennsylvania.

Sept. 10, 1946.

104

William A. Gray, Francis T. Anderson, Lester J. Schaffer, Edwin P. Rome, and Barnes, Dechert, Price, Smith and Clark, all of Philadelphia, Pa., for plaintiff.

William A. Schnader, Bernard G. Segal, J. Pennington Straus, George Wharton Pepper, and Morris Wolf, all of Philadelphia, Pa., and Joseph M. Proskauer and J. Alvin Van Bergh, both of New York City, for defendants.

KIRKPATRICK, District Judge.

This action is for injunctive relief and for damages alleged to have been incurred as the result of a conspiracy among the defendants to monopolize the motion picture business in Philadelphia. Evidence relating to the primary issue of the existence of the conspiracy was taken and the Circuit Court of Appeals, 150 F.2d 738, 745, reversing the judgment of this Court, 54 F. Supp. 1011, has ruled that there was a con-

spiracy as charged. In accordance with an agreement of the parties the plaintiff did not offer evidence relating to the issue of damages at the first stage of the trial, pending the decision of the Court on the question of liability under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. Testimony relating to damages has now been taken and that issue is before this Court for disposition.

The only reference to damages in the opinion of the Circuit Court of Appeals is the following:

"As the trial court also found, plaintiff has unquestionably suffered loss. We have no means of knowing the extent of that loss. Perhaps, upon remand plaintiff may be able to prove its damages; or, the factors to be considered may be subject to so many unknowns that such damages may veer toward the speculative. We specifically pass no opinion on these problems."

■ In view of the differences between the parties as to the effect of certain findings of fact made in the first stage of the case, it may be well to say before going further that I do not understand that any finding not adopted by the Circuit Court of Appeals either expressly or by necessary implication as a basis for its decision is irrevocable. In as much as this is merely a continuance of the trial begun November 15, 1943, all relevant evidence in the first as well as the second stage of the trial will be considered, and I see no reason why the findings may not be changed or modified, if, in the light of the entire record now before me, I should conclude that they are wrong or that, as stated, they did not correctly express what I meant to say.

The basic facts of the case, appearing in the findings of this Court and in the opinions of this Court, 54 F.Supp. 1011, and of the Circuit Court of Appeals, 150 F.2d 738, will not be restated here.

■ The "damage period" is from September 1, 1941, to December 8, 1942, the date of bringing this suit. During this period the plaintiff's theatre, the Erlanger, was to all intents and purposes closed, although some few exhibitions given in it produced gross rentals and other income, amounting in all to $7,237.59. Being unable

to obtain first-run pictures, Mr. Goldman did not attempt to operate the theatre on second or subsequent runs. He was not bound to do so. The duty to lessen damages which the law imposes on an injured party does not go beyond the exercising of ordinary care and incurring moderate expense. He is certainly not required to enter upon and carry on a business differing in important particulars from that in which he has been or intends to be engaged.

The plaintiff claims as damages (1) loss of the profits which it contends it would have made during the damage period had it been able to operate the Erlanger as a first-run theatre in free competition, plus (2) out-of-pocket expenses amounting to $25,007.34, being what it actually cost it to maintain its lease of the Erlanger during the damage period, less the $7,237.59 of income obtained from it.

■ Obviously, the plaintiff is not entitled to both items of its claim. They are based upon two entirely distinct and mutually exclusive theories of recovery. On the profit theory the plaintiff's damages are the excess of income over cost of a purely hypothetical operation of a going business. Of course, any loss arising from the use to which the property was actually put, such as the so-called out-of-pocket expenses, does not enter into the calculation at all, except possibly as evidence in connection with estimating the hypothetical cost figure. On the out-of-pocket theory, the damages are what it actually cost the plaintiff not to operate the property as a first-run theatre. If it be assumed that the plaintiff would have made money had it operated the theatre, no loss would have been incurred in the hypothetical operation and I do not see how the plaintiff can ask the Court first to assume a state of facts under which it lost no money but, on the contrary, realized a profit, and then say "But, as a matter of fact, the property was not operated as a moving picture theatre at all, but simply maintained for what use could be made of it," and ask the Court to be allowed to have its theoretical profit and, in addition, add to that the amount spent to maintain the property. The plaintiff may not have damages both for a net profit and a net loss, for the same fifteen months.

■ Because I am of the opinion that the plaintiff is entitled to recover the larger item, of profits, I shall not deal further with the out-of-pocket expenses, remarking only that, had the plaintiff failed to make a case for profits, it would unquestionably be entitled to its net actual loss.

The allowance of profits as damages is entirely a question of sufficiency of evidence. There is no objection to profits, as such, as an element of recoverable damage. In every case the question is whether the data of which the evidence consists is such that a just and reasonable estimate can be drawn from it, so that a verdict will not be based on mere speculation or guesswork, it being fully recognized that it is not necessary to show with absolute accuracy how much profit would have been earned.

I do not find in any decision of the Supreme Court the hard and fast rule, which the defendants assert exists, that under no circumstances can there be any recovery for loss of profits in an anti-trust case unless an established business has suffered. If there were such a rule it would end the plaintiff's case on profits, because the plaintiff had no established going business in first-run showings at the time of the tort. In fact the Erlanger had not, since it was built, been operated as a moving picture theatre at all, except for a period of about nine months, occurring more than ten years before the plaintiff leased it.

There are several lower federal court opinions in which general statements in accord with the defendants' contention appear, but in them there were no facts from which the amount of profits could have been determined otherwise than by a pure guess, and that was the nub of the decision in each case. Of course, when the plaintiff has no established business showing potentiality of profits to start with, it will not be so easy for him to produce evidence from which profits can be determined with any degree of certainty, and in most cases it has turned out that he was unable to do so. But there is no logic or sound policy in a rigid rule that will foreclose him if his evidence, with-

out it, is sufficient to get the Court beyond the guessing stage. The whole matter is a question of the evidence. "It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." Eastman Kodak Co. v. Southern Photo Material Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684. " * * * it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544. If these standards are met, the absence of the additional factor of past performance of a going business—a useful factor no doubt—should not be fatal to the plaintiff's case.

Recent decisions of the Supreme Court appear to be putting more and more emphasis upon the effect of the defendant's wrongful act where it is the cause of the plaintiff's inability to produce complete and accurate data from which his loss can be ascertained. Of course, he must always produce all the evidence that he can but the Supreme Court seems to be coming to the point of view that, where the tort itself has created a partial blackout, the standard which the plaintiff's evidence must meet will be somewhat lowered.

Bigelow et al. v. RKO Radio Pictures, Inc., et al, 327 U.S. 251, 66 S.Ct. 574, 580, filed February 25, 1946, the most recent decision of the Supreme Court upon the question, was stressed by both sides as supporting their respective views. In that case the plaintiff's theatre had been operated for some 20 years by the plaintiff's predecessor, so there was an established business and the decision is not in point, but there is nothing in the opinion not consistent with the view just expressed. The Supreme Court, reversing the Circuit Court· of Appeals, reinstated a verdict for loss of profits, holding that the jury had made "a just and reasonable estimate of the damage based on relevant data." The relevant data before the jury was of two kinds: (a) "The comparison of petitioners' (plaintiffs') receipts before and after" the defendants' wrongful acts, and (b) "the comparison between petitioners' receipts and those of the

Maryland Theatre (a comparable theatre operated by the defendants) during the five years in question" while the conspiracy was in effect, and the Court decided that "Each of the two classes of evidence introduced by petitioner tended to show damage" and established that the damage was the result of the tort.

When it came to consider the adequacy of the evidence to show the amount of the damages, the Court held that "The comparison of petitioners' receipts before and after respondents' unlawful action impinged on petitioners' business afforded a sufficient basis for the jury's computation of the damage," and that, therefore, "there was evidence to support a verdict for damages on at least one theory * * *." The Court did not rule either expressly nor, I think, by necessary implication, that the comparison of the earnings of the Maryland Theatre was not also evidence relevant for the same purpose or that it would have been an insufficient basis for the verdict, even in the absence of proof of the plaintiffs' prior earnings. A ruling on that point was unnecessary, and it was left undecided. The Court said: "We do not imply that the verdict could not be supported on some other theory," and the only other theory which the Court discussed was the comparison of the earnings of the plaintiffs' theatre with those of the Maryland Theatre. The Court did, however, make the general observation that " 'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery' for a proven invasion of the plaintiff's rights."

Turning now to the facts of the present case, it appears that the plaintiff was about as close to having an established business at the Erlanger as it could be without actually having one. It was actively in the moving picture business. For a number· of years (since 1934) it had been operating with marked success a chain of second-run theatres, two of them in downtown Philadelphia. Mr. Goldman, the owner of the plaintiff's stock, was an experienced and successful motion picture operator, thoroughly familiar with the conditions of the

business in Philadelphia, having been, among other things, at one time the general manager of Warner Bros. (one of the defendants), for the Philadelphia area. In September, 1941, the plaintiff had, in the Erlanger Theatre, a "plant"—modern, handsomely appointed, fully equipped and ready to go. It had an organization complete in the top brackets, needing only a comparatively small addition of theatre personnel. These facts go far toward eliminating some major uncertainties which in most cases make the success of a new business problematical, I mean uncertainties as to the experience and skill of the management and its familiarity with the conditions of the business, the efficiency of the organization and the adequacy of the plant.

With this background to start with, we must determine whether the evidence in the case is sufficient to supply a basis for estimating probable profits with the degree of accuracy which the law requires. Naturally the plaintiff could offer no record of past performance at the Erlanger. The defendants' wrongful conduct precluded it from doing so. In its place, the plaintiff produced complete data showing the business done and profits earned at each of the other first-run theatres in Philadelphia, including the nearby Mastbaum, during the damage period. Is this evidence sufficient?

In dealing with the question, it should be kept in mind that the motion picture business is in many respects unique. Certainly, the problem of estimating its probable return is very different from that presented in the case of a manufacturing business. In a sense, it is much simpler. Of the three major factors, cost, prices and volume, the first two can be predicted with very much greater accuracy than in the ordinary industry or business. As to costs, rental is usually fixed or ascertainable, wages and salaries do not constitute a major part of operating costs and items like advertising service, electricity, maintenance and repair are within limits ascertainable. Film rental, the largest factor in costs, is usually on a percentage basis and consequently bears a constant ratio to receipts. At any rate, in the present case, the parties are in substantial agreement as to what would have been the cost of operating the Erlanger during the damage period. As to prices, wide and unpredictable fluctuations need not be expected, and in the present case the evidence shows that the charges for admissions at the first-run theatres during the damage period were quite stable.

This narrows the problem to the volume of business which would have been done by the Erlanger Theatre during the damage period.

The plaintiff met its problem by taking the volume of business in dollars done at the five first-run theatres in Philadelphia, allocating to the Erlanger one-fifth of the total (making allowance for the fact that the Mastbaum was open for only three months of the period), and deducting the estimated cost of operation of the Erlanger. The plaintiff's evidence also shows the actual gross income of the Mastbaum Theatre during the three months of the damage period in which it was showing pictures.

The defendants argue that the evidence is insufficient to form a basis for an estimate for profits, because of fundamental differences between the Erlanger and any other theatre. Of course, no two theatres are alike but in this case the differences really boil down to two things, namely, inferior location, and the fact that the Erlanger had not shown first-run pictures for over ten years and had no reputation or good will in that field. There were other points, and they will be considered later on, but they are not of much importance.

The Mastbaum Theatre has been mentioned. It is conceded that from the time it opened, September 4, 1942, to the present time, it has been conspicuously successful. I think it is a directly comparable theatre and that its performance throws a strong light upon the profit possibilities of the Erlanger.

The Mastbaum is much bigger than the Erlanger, having 4,387 seats as against the Erlanger's 1,859. It is, I suppose, a finer theatre although the appointments of the Erlanger are as handsome as could be desired and from the standpoint of the theatre-going public there is not very much difference. If the location of the Erlanger is bad, that of the Mastbaum is almost as bad. It is on the same side of Market

108

Street, only one block nearer the center of the city than the Erlanger and in the same kind of second-rate surroundings. I doubt that having a larger theatre nearby would have any noticeable effect on the Erlanger's business, given first-class pictures at the latter. The Erlanger is quite large enough to make money as long as it can draw good houses.

There is also another consideration which has an important bearing on the question. Some time toward the end of 1940 the moving picture business, like almost every other business, began to feel the effects of the war boom. There was a great up-surge in theatre attendance which soon brought it to a high level which it has maintained uninterruptedly until the present time. Higher wages, full employment and migration to the centers of industry naturally produced a greatly augmented public with money to spend on first-run shows. It would be simply ignoring reality to say that there is any reasonable doubt that a first-class theatre showing Grade A pictures would have made money in Philadelphia during the years 1941 and 1942.

I have no hesitation in making the finding that, had the Erlanger operated in free competition during the damage period, it would have made profits. I also think that the evidence offered by the plaintiff is sufficient to enable the Court to estimate the amount of probable profits with a reasonable degree of accuracy, which is all that the law requires.

In arriving at an estimate, I shall consider, though not exclusively, the evidence of the average gross income of the other Warner theatres. I do not accept the plaintiff's theory of average profits of

the defendants' theatres as controlling, but will take it also into consideration as a part of the entire picture. I shall give particular attention to the record of the Mastbaum.

I do not regard my answer to the plaintiff's 29th request for finding of fact, which appears on page 1016 of the report of the case in 54 F.Supp., as binding upon me to the extent that I must now disregard the record of the Mastbaum. The comment of the Circuit Court of Appeals contained in the 14th footnote to its opinion amounts to a ruling that I should have given consideration to the successful reopening of the Mastbaum as evidence that there was room for and need of another first-run motion picture theatre in Philadelphia. While I do not believe that the Circuit Court of Appeals intended to rule that the Mastbaum opening was evidence of conditions as of as early a date as November 9, 1940, it certainly meant to say that it was evidence of a demand at some time earlier than the date of the actual opening of the Mastbaum. At any rate, I now state that I think that the receipts at the Mastbaum may and should be considered as some evidence of what the receipts at the Erlanger would have been from a time substantially prior to September 4, 1942.

In making an estimate of the profits lost through the enforced closure of the Erlanger, certain unfavorable factors must also be considered which, I think, would have reduced its receipts below those of the Mastbaum and also below those of the average Warner theatre in Philadelphia.* To enumerate these they are:

(1) The location. The Erlanger location, although only a block away, is somewhat

* The plaintiff takes the position that the adoption by the Circuit Court of Appeals of this Court's affirmance of the plaintiff's requests Nos. 19 and 30, constitutes a ruling, binding upon this Court, that the Erlanger is, in all respects having to do with its profit potentialities, the equal of the other Warner theatres in Philadelphia. Consequently, the plaintiff argues, I am not free to fix a figure for the Erlanger's probable profits, below the average profits of the Warner Philadelphia theatres. I do not believe that the Circuit Court of Appeals, in adopting these findings intended to make such a ruling. In making the findings, I was not thinking about damages but was considering the situation as bearing upon the defendants'. conduct in refusing pictures to the Erlanger—the motive for it—and so was the Circuit Court of Appeals. All that I meant by these findings was that there was nothing about the Erlanger Theatre itself which would furnish an adequate reason for the defendants' refusal to supply it with first-run Grade A pictures, and I doubt that the Circuit Court of Appeals meant more.

less favorable than that of the Mastbaum and a great deal less favorable than that of any of the other Warner theatres. However, I think that, in the light of the evidence of the great increase in the theatregoing public beginning in 1941, the calculation, in percentages, of the adverse effect of the location made by the defendants' experts is too high, though location is undoubtedly a factor which would operate to reduce gross admissions.

(2) The fact that the Erlanger had not been a first-run theatre within recent times, having no established reputation with the public or goodwill, plus the probable effect which this would have, (for a time at least) on the allocation of the best box office attractions to it, even under conditions of free competition.

(3) Lack of air conditioning equipment—a deficiency which, of course, could be remedied, but which would mean spending money and consequently some reduction of profits.

(4) The contingent increase in rentals provided for in the lease.

(5) The fact that the Mastbaum figures correspond with only the last three months of the damage period. As the war boom was on the increase, these would probably be the best three months of the period.

I do not pretend that there is not an element of speculation or guesswork in making an estimate of probable profits on the evidence presented. The fact, however, that only approximate accuracy is required by the decisions of the Supreme Court indicates that no one expects the impossible and that every estimate of what would have occurred under hypothetical conditions is bound to contain elements of speculation. But the evidence, I think, is sufficient on which to reach a reasoned conclusion the basis of which is relevant, informative and logically significant data.

I, therefore, find as a fact that the plaintiff, but for the wrongful acts of the defendants, would have earned profits at the Erlanger Theatre amounting to $125,000 during the damage period.

The statements of fact made in the foregoing opinion may be considered as special findings of fact and the statements of the law may be considered as conclusions of law. If anything in the foregoing opinion is in conflict with any finding of fact or conclusion of law heretofore made, the statements in the opinion may be taken as modifying the findings or conclusions.

An order may be submitted for judgment of damages and injunctive relief in favor of the plaintiff.